# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**RUSSELL A. JOHNSON**
**HEATH Y. JOHNSON**
**SUZY ST. JOHN**
Johnson, Gray & Macabee
Franklin, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| TAMI L. DUVALL, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 03A04-1108-CR-447 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE BARTHOLOMEW CIRCUIT COURT
The Honorable Stephen R. Heimann, Judge
Cause No. 03C01-1008-MR-1652

**September 6, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Tami L. Duvall ("Duvall") appeals her conviction for Murder, a felony,[1] five of her six convictions for Insurance Fraud, Class C felonies,[2] and two of her three convictions for Obstruction of Justice, Class D felonies.[3] We affirm the conviction for Murder, but reverse and remand with instructions to vacate five of the convictions for Insurance Fraud and two of the convictions for Obstruction of Justice.

**Issues**

Duvall presents three issues for review:

I. Whether the trial court abused its discretion in admitting, pursuant to the intent exception of Indiana Evidence Rule 404(b), testimony from Duvall's former boyfriend that he believed Duvall had poisoned him;

II. Whether the admission of evidence suggesting that Duvall stole a bottle of morphine from her workplace is fundamental error; and

III. Whether Duvall committed only a single offense of Insurance Fraud and a single offense of Obstruction of Justice.

**Facts and Procedural History**

Around 8:00 a.m. on August 24, 2007, Duvall placed a 9-1-1 call and told operator Angela Lee that she had arrived home from work and found her estranged husband, Alan Duvall ("Alan"), dead in a chair in the back yard. According to Duvall, Alan had come over the prior evening to work on a malfunctioning air conditioning unit, became overheated, and went outside to cool down. He had then slept outside. Duvall advised the operator that Alan

---

[1] Ind. Code § 35-42-1-1.

[2] Ind. Code § 35-43-5-4.5(a)(2).

[3] Ind. Code § 35-44-3-4(a)(3) [now repealed]. Duvall concedes there is sufficient evidence to support a single conviction for Insurance Fraud and a single conviction for Obstruction of Justice.

2

was a heavy drinker.

It was initially believed that Alan, who had a blood-alcohol content of 0.436%, died of alcohol poisoning. However, several of Duvall's and Alan's family members contacted the Columbus Police Department to convey their suspicions of foul play, prompting Detective Marc Kruchten to request an autopsy of Alan's body. Toxicology reports from the autopsy revealed that Alan's blood had a morphine concentration of 6,590 nanograms per milliliter (approximately 100 times a therapeutic dose) and 3,229 nanograms per milliliter of cyclobenzaprine, a muscle relaxer (approximately eight times a therapeutic dose). In light of this evidence, Detective Kruchten began to conduct a homicide investigation.

The investigation revealed that Alan and Duvall, who had been separated for several months, had significant financial problems. Creditors were continually calling the marital residence to discuss delinquencies of various consumer accounts and past-due vehicle payments. The marital residence was a subject of foreclosure proceedings, and college tuition for Duvall's youngest daughter had become due. Alan had only recently begun to work with a glass installation company after several job changes, and Duvall's earnings as a certified nurse's aide were inadequate for the mounting financial obligations.

A short time before Alan's death, Duvall had encouraged Alan to procure a $100,000 life insurance policy and name her as the beneficiary. According to the couple's friends and acquaintances, Alan had been willing to do so because he believed it was a mortgage insurance policy and he expected to move back in with Duvall as soon as her daughter moved to college. The policy had been obtained through insurance agent Gary Ruddell ("Ruddell"),

with whom Duvall was having an extra-marital affair. Although, according to Ruddell, he advised Duvall not to attempt to collect on the policy because Alan died during the policy "grace period" and it would look suspicious, (Tr. 2134) Duvall promptly made a claim for payment.

Motorists Life Insurance did not immediately pay the claim, but instead assigned Dennis Thomas ("Thomas") to investigate the circumstances surrounding Alan's death. Thomas interviewed Duvall on multiple occasions, as did Detective Kruchten. Duvall maintained that she had, upon arriving home from early morning home health duties, observed Alan slumped in his backyard chair, and immediately called 9-1-1 and tried, without success, to pull Alan from his chair to perform CPR.

Early in the investigation, Duvall suggested that Alan had been a drug user and had "hid the other part of his life" from her. (Tr. 1806.) However, she claimed to lack specific knowledge of what Alan had ingested or how he did so. Ultimately, in an interview with Detective Kruchten and Bartholomew County Prosecutor William Nash, Duvall stated that she had observed Alan take muscle relaxers of the brand name Flexeril, which he had allegedly obtained from his cousin, Zillah Thompson ("Thompson"). She also described seeing Alan, on the last evening of his life, in possession of an eye dropper type bottle with a lavender-colored liquid inside (a description consistent with Roxanol, a liquid form of morphine used for hospice patients). She admitted to disposing of empty medication and alcohol bottles after Alan's death.

Meanwhile, the police investigation uncovered several witnesses who contradicted

4

Duvall's claims of a prompt 9-1-1 call and Alan's drug use. Also, one of Duvall's former employers, Miller's Merry Manor, had documented the mysterious disappearance of a bottle of Roxanol. Thompson admitted that she had left medications, including Flexeril, out in plain view at her house, and that she had recently had a block party attended by the Duvalls. However, those who knew Alan, including Thompson, insisted that Alan was opposed to ingesting drugs.

On August 6, 2010, the State charged Duvall with Murder, six counts of Insurance Fraud, and three counts of Obstruction of Justice. On April 5, 2011, Duvall's jury trial commenced. On April 22, 2011, the jury found Duvall guilty as charged. On May 25, 2011, she received an aggregate sentence of sixty and one-half years (fifty-five for Murder, six concurrent sentences of four years for Insurance Fraud, and three concurrent sentences of one and one-half years for Obstruction of Justice). Duvall now appeals.

**Discussion and Decision**

I. Admission of Evidence – Alleged Prior Poisoning

**Standard of Review**

A trial court has broad discretion in ruling on the admissibility of evidence. Camm v. State, 908 N.E.2d 215, 225 (Ind. 2009). We will reverse the trial court's decision only when it is clearly against the facts and circumstances before the court; moreover, even if the trial court abused its discretion in admitting evidence, the judgment will be undisturbed if the decision to admit evidence is harmless error. Granger v. State, 946 N.E.2d 1209, 1213 (Ind. Ct. App. 2011). "Harmless error occurs 'when the conviction is supported by such

5

substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction.'" Id. (quoting Lafayette v. State, 917 N.E.2d 660, 666 (Ind. 2009)). Accordingly, we reverse only when the record as a whole discloses that the evidence admitted in error likely had a prejudicial impact upon the mind of the average juror, thereby contributing to the verdict. Id.

**Analysis**

During the investigation following Alan's death, police learned that Stephen Brown ("Brown"), Duvall's former boyfriend, had made a June 27, 2005 statement to Farm Bureau Insurance special investigator John Moon ("Moon") in the course of an investigation into alleged theft of Duvall's property. Brown denied that he had stolen Duvall's property and, during the interview, advised Moon of his suspicion that Duvall had tried to poison him with tainted pudding immediately before requesting his signature and identifying information on a life insurance policy.

Prior to trial, Duvall filed a motion in limine seeking to exclude Moon's testimony with regard to the alleged poisoning attempt. The State conceded that such testimony would be inadmissible unless the defense opened the door to its admissibility.

In his opening statement, Duvall's counsel advanced the defense theory that Alan had killed himself. The factual scenario described by counsel essentially mirrored those facts described by Duvall in her interview with Detective Kruchten and Prosecutor Nash; that is, on the last night of his life, Alan was taking pills and had "an eye dropper full of morphine." (Tr. 300.) According to counsel, Duvall came home, found Alan dead, and "freaked out,"

6

thus explaining the delay in calling 9-1-1. (Tr. 300.) The State argued that the defense had opened the door to Brown's testimony in order to contradict a particular factual scenario portrayed by the defense and, after a bench conference, the trial court agreed.

Brown testified that, around Thanksgiving of 2004, Duvall had arrived at his home with food, including a pudding that she insisted he must eat because her daughter had made it especially for Brown. When Brown took a few bites of the pudding, it tasted "like aspirin dissolving" and he felt "very out of it" for several hours. (Tr. 2318.) Duvall had also brought a life insurance policy application, and claimed that she needed information from Brown so that he could be the listed beneficiary. She asked Brown to sign and provide his Social Security number. Brown did not do so, and Duvall left, taking with her the bowl and plate that she had brought.

Duvall claims that the trial court admitted this evidence in violation of Evidence Rule 404(b), which provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Evidence of extrinsic offenses poses the danger that the jury will convict the defendant because he or she is a person of bad character generally, or has a tendency to commit crimes. Bassett v. State, 795 N.E.2d 1050, 1053 (Ind. 2003). The rationale for the prohibition against bad act and character evidence is that the jury is precluded from making the forbidden inference that the defendant had a criminal propensity and therefore engaged in the charged conduct. Monegan v. State, 721 N.E.2d 243, 248 (Ind. 1999). When a defendant

7

objects to the admission of evidence on the grounds that it violates Evid. R. 404(b), and specific acts evidence is offered for "other purposes," the trial court is to "determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act … determine that the proponent has sufficient proof that the person who allegedly committed the act did, in fact, commit the act … and third, balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403." Camm, 908 N.E.2d at 223.

In admitting Brown's testimony, the trial court relied upon four cases where prior conduct evidence had been admitted on the issue of intent after the defendant had presented a particular factual claim to refute the charge. In Wickizer v. State, 626 N.E.2d 795 (Ind. 1993), the defendant charged with molesting a fourteen-year-old male had admitted touching the victim's penis but had insisted that his intention was not sexual gratification, but providing assistance. The State had presented the testimony of two other witnesses regarding their youthful sexual experiences with the defendant. Id. at 796. Our Supreme Court, in reviewing the appellant's claim that the evidence was admitted in violation of Evidence Rule 404(b), explained:

> The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. The trial court must then determine whether to admit or exclude such evidence depending upon whether 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

8

misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.' Evid. R. 403.

Id. at 799. The Court found "the admission of the prior conduct evidence to have been error," although reversal was not compelled because there existed substantial independent evidence of guilt. Id. at 800.

In Koo v. State, 640 N.E.2d 95, 100 (Ind. Ct. App. 1994), trans. denied, a physician charged with raping a patient during a medical appointment "introduced substantial evidence to suggest that the victim hallucinated the sexual encounter." The State then presented two witnesses who each testified that Koo had raped her during a medical appointment. On appeal, a panel of this Court reviewed the defense opening argument, cross-examination, and closing argument and concluded: "Clearly, the defense had presented a specific factual claim of hallucination that the prosecution was entitled to rebut with evidence of prior misconduct." Id. at 102.

In Burgett v. State, 758 N.E.2d 571 (Ind. Ct. App. 2001), trans. denied, the State had presented evidence of an attempted murder defendant's drug and gang activity. In considering whether the admission of the evidence was an abuse of discretion, a panel of this Court acknowledged that "the exceptions in Evid. R. 404(b) are only available when a defendant goes beyond merely denying the charged crimes and affirmatively presents a specific claim contrary to the charge," and further acknowledged that the defendant did not present any evidence at trial. Id. at 580. However, the Court observed that Burgett's counsel had presented a specific claim contrary to the charge by insinuating, during cross-

examination, that the victim lied to avenge his friend's death when he testified that Burgett was the person who shot him. Id. Consequently, no abuse of discretion was found. Id.

Finally, the trial court relied upon Bryant v. State, 802 N.E.2d 486 (Ind. Ct. App. 2004), trans. denied. Bryant was convicted of murdering his step-mother and, on appeal, challenged the trial court's admission of violent rap lyrics Bryant had either composed or plagiarized. Although it found that Bryant had failed to show that the exhibits constituted evidence of any prior crime or misconduct, the appellate court observed that "prior misconduct evidence may be admitted to rebut a specific factual claim raised by the defendant" and considered the exhibits, containing reference to the police finding a body in the trunk of a car, relevant "to rebut Bryant's claim that [his father] murdered Carol." Id. at 499.

Subsequent to the foregoing line of cases, our Indiana Supreme Court reaffirmed the Wickizer "view that an expansive reading of the intent exception would be inconsistent to the principal thrust of [Rule 404(b)] itself." Lafayette v. State, 917 N.E.2d 660, 663 (Ind. 2009). The Court clarified that the "intent exception [is to] be narrowly construed." Id. at 664.

In opening statements, Duvall's counsel introduced a theory that Alan caused his own death and the State seized the opportunity to offer evidence of an alleged prior poisoning, reasoning that the defense had made a "very specific contrary claim" of how Alan's death occurred. (Tr. 322.) However, consistent with our Indiana Supreme Court's guidance, we cannot conclude that the intent exception of Rule 404(b) is to be read so broadly. Wickizer, evincing a narrow construction of the intent exception, specified that it is when a defendant

10

asserts a particular contrary intent that the State may respond with prior acts (to the extent genuinely relevant) to prove intent at the time of the charged offense. 626 N.E.2d at 799. Counsel's references, in opening statements, suggesting that Alan died by his own hand did not admit that Duvall engaged in the conduct at issue and then assert a particular non-criminal intent. For example, the defense did not concede that Duvall gave Alan drugs but only for therapeutic reasons. Nor did the defense "introduce substantial evidence" of a contrary factual scenario, as in Koo. Duvall did not, in opening statements, open the door to a broad application of the intent exception.

Nonetheless, "[t]he improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction." Turner v. State, 953 N.E.2d 1039, 1059 (Ind. 2011). Here, the State presented substantial evidence of Duvall's guilt.

Duvall, who was under great financial stress, had complained frequently to her friends, co-workers, and daughter that Alan was unreliable and did not contribute adequately to family finances. Days before Alan's death, Duvall prevailed upon him to obtain a life insurance policy in the amount of $100,000. She was the beneficiary. Alan had told his friends and co-workers that he and Duvall were reconciling; meanwhile, Duvall had told her friend and daughter that there would be no reconciliation. According to the testimony of Rhonda Brown ("Rhonda"), Duvall had told Rhonda that she wanted to be with Ruddell. Also, Duvall's daughter was adamantly opposed to Alan's moving back with Duvall.

11

Rhonda further testified that Duvall had shown her small round yellow pills, claiming that she had seen a cousin give Alan the pills, and wondering aloud if "he took the whole bottle, would you die." (Tr. 1315.) Duvall had also warned Rhonda not to tell Alan that the policy he was procuring was for life insurance as opposed to mortgage insurance.

Thompson testified that she was Alan's cousin and had hosted the Duvalls at a block party shortly before Alan's death. Thompson habitually left her medications, including a very large bottle of Flexeril, on a table inside her front door. After the party, the bottle of Flexeril appeared less full. She denied offering Alan Flexeril from that bottle and testified that she had never seen Alan take a prescription or illicit drug.

Charles Rose ("Rose") testified that he had been working at Miller's Merry Manor as a charge nurse on March 2, 2007, when he had absent-mindedly left a nearly-full bottle of Roxanol on a hospice patient's bedside table. When he went to retrieve it after lunch, Duvall was "the only staff member present" and the bottle was missing. (Tr. 1426.) When questioned, Duvall had responded that she had not seen the bottle but had seen the patient's daughter in the room. According to Rose, he "kind of knew better" because the daughter was a teacher who never visited during the daytime. (Tr. 1434.)

Additionally, testimony from various investigators, friends, acquaintances, and family members established that Duvall had given many conflicting versions of the circumstances surrounding Alan's death. During the initial investigation, Duvall claimed to have placed the 8:00 a.m. 9-1-1 call as soon as she returned home and opened the door to see Alan slumped over. However, Duvall had chatted with convenience store clerk Kim Foster as Foster

12

opened the store sometime before 7:00 a.m. and, when Foster expressed concern for Duvall, Duvall told Foster that she had discovered her husband dead in a lounge chair. Ruddell testified that, during his 7:30 a.m. call with Duvall, she told him she was tying up her dogs and Alan was "unconscious." (Tr. 2122.) Duvall's neighbors testified that, around 7:00, Duvall had come to their door but left without waiting for a response to her knock. Jennifer Melton then looked out the window and saw that Duvall was in the back yard trying to tie up her dogs. When Duvall was confronted with phone records suggesting a significant delay after she arrived home and before the 9-1-1 call, Duvall admitted to making some calls but claimed to have been in shock.

After Alan's death, Duvall opposed an autopsy. She arranged to have his body cremated, although Alan had a burial plot. According to Duvall's daughter, Duvall had been upset about the delay in the cremation. Duvall told Detective Kruchten that she had served Alan some Long Island iced teas on the evening before his death. She told Alan's former girlfriend, Mary Beth Kahle, that Alan had not been drinking at all, then conceded that he had one beer and one shot. She told her son that she and Alan had been drinking tequila the night before his death. During the insurance investigation, Duvall insisted that Alan had initiated the life insurance purchase.

Eventually, Duvall provided investigators with scenarios under which Alan had both Roxanol and Flexeril in his possession. However, persons familiar with Alan's habits uniformly denied that he was willing to ingest either a prescription or non-prescription drug. Moreover, police officers testified that neither Roxanol nor Flexeril was a drug typically

abused or available for street purchase. Evidence showed that Duvall had been in the proximity of both drugs shortly before Alan's death.

In light of the substantial independent evidence of Duvall's guilt, we conclude that there is not a substantial likelihood that the challenged evidence contributed to the verdict.

## II. Admission of Evidence – Missing Roxanol

Duvall also claims that the trial court admitted Rose's testimony as to the missing Roxanol in contravention of Evidence Rule 404(b) and "the conditional relevance standard of Evidence Rule 104(b)." Appellant's Brief at 26. According to Duvall, the evidence that she "stole liquid morphine from Miller's Merry Manor is tenuous at best." Appellant's Brief at 26. She emphasizes the testimony of director of nursing Robyn Sams, who stated that she "decided to mark the bottle as spilled" and admitted that she could not prove where it went. (Tr. 1509.)

At the time of Rose's testimony, Duvall lodged no contemporaneous objection. The defendant's failure to lodge a contemporaneous objection at the time evidence is introduced at trial results in waiver of the error on appeal. Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010), reh'g denied. "The purpose of this rule is to allow the trial judge to consider the issue in light of any fresh developments and also to correct any errors." Id. A claim that has been thus waived can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. Id. The fundamental error exception is "'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'"

Id. (quoting Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006)). The exception is available only in "'egregious circumstances.'" Id. (quoting Brown v. State, 799 N.E.2d 1064, 1068 (Ind. 2003)).

Pathologist Dr. Greg Brown testified that Alan died of an overdose of morphine. Accordingly, Rose's testimony was admitted for a purpose other than to show that Duvall had a propensity to engage in crime; specifically, it was admissible to show that Duvall had access to the murder weapon. See Pickens v. State, 764 N.E.2d 295, 299 (Ind. Ct. App. 2002) (evidence that police saw an assault rifle in the defendant's parents' home two years before murder was admissible as evidence that defendant had access to weapon of the type used in the murder), trans. denied.

"But before a defendant's alleged prior misconduct evidence can be admitted for a permissible purpose under Rule 404(b), there must be sufficient proof from which a jury could find that the defendant committed the prior acts in question." Perry v. State, 956 N.E.2d 41, 59 (Ind. Ct. App. 2011) (citing Camm, 908 N.E.2d at 223-24). In other words, "'similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" Id. (quoting Huddleston v. United States, 485 U.S. 681, 689 (1988)).

Relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. Only relevant evidence is admissible at trial. Evid. R. 402. Testimony that Roxanol went missing at Miller's Merry Manor is

15

relevant to the issue of whether Duvall committed murder by morphine only if Duvall had access to the particular missing drug and then took it. "When conflicting evidence persists about a person's involvement in Rule 404(b) specific acts, the question is one of conditional relevance, which is governed by Rule 104(b)." Camm, 908 N.E.2d at 223. According to Rule 104(b):

> When the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

"Whether Rule 104(b) should result in the exclusion of evidence depends upon whether 'the fact upon which the evidence depends is too speculative' at the time a party seeks introduction of the evidence." Granger, 946 N.E.2d at 1216 (citing Cox v. State, 696 N.E.2d 853, 861 (Ind. 1998)). Evidence of uncharged conduct is admissible under Rule 104(b) if there is likely to be sufficient proof for a reasonable jury to find the uncharged conduct proven by a preponderance of the evidence. Camm, 908 N.E.2d at 224. Sufficiency of the evidence under 104(b) is reviewed for an abuse of discretion. Cox, 696 N.E.2d at 861.

As a predicate, the State introduced evidence of Duvall's access to the premises. However, as a certified nurse's aide, Duvall was not permitted authorized access to patient drugs, and so the State necessarily alleged a theft. Rose testified that Duvall was working with him on March 2, 2007 on a particular ward that housed a hospice patient who had been prescribed Roxanol. Rita Bell ("Bell"), a nurse then working as a nurse's aide, was also on duty. Rose testified that, when he and Bell left to go to the dining room, Duvall was left behind to serve lunch to bedridden patients. Bell also testified that she had worked with

16

Duvall on the day in question. Bell had seen a bottle of Roxanol on a patient's table, but did not pick it up because she was not in charge of the medicine cart on that day.[4] Other testimony indicated that, when Duvall was questioned as to the missing Roxanol, she gave a suspicious account of a daytime visitor. The State presented sufficient evidence from which the trial court could have found that there was likely to be sufficient proof for a reasonable jury to find Duvall's theft proven by a preponderance of the evidence.

Indiana Evidence Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that evidence. Carter v. State, 766 N.E.2d 377, 382 (Ind. 2002) (citing Richmond v. State, 685 N.E.2d 54, 55-56 (Ind. 1997)). "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury." Id. (citing Evans v. State, 643 N.E.2d 877, 880 (Ind. 1994)).

The value of evidence that Duvall had access to the murder weapon, a rare form of morphine typically used for palliative care for dying patients, was high. Moreover, the access had been in recent proximity to Alan's death. The admission of such evidence was not

---

[4] Bell was licensed as a nurse, but was working a shift as a certified nurse's aide on that particular day.

unfairly prejudicial. The trial court did not abuse its discretion and did not commit fundamental error by allowing Rose to testify regarding missing Roxanol.

### III. Continuing Crimes

Finally, Duvall argues that the continuing crime doctrine is applicable to her multiple convictions for Insurance Fraud and Obstruction of Justice. "The continuing crime doctrine essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." Riehle v. State, 823 N.E.2d 287, 296 (Ind. Ct. App. 2005), trans. denied. The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes, but rather defines those instances where a defendant's conduct amounts to only a single chargeable crime. Id.

Duvall's convictions for Insurance Fraud stem from six false statements given in a single insurance investigation interview on May 29, 2008. Her three convictions for Obstruction of Justice stem from a single crime scene clean-up (in which she removed an alcohol bottle, medication container, and foam from Alan's mouth) on August 24, 2007. The State concedes – and we agree – that Duvall's conduct was continuous so as to constitute one offense of Insurance Fraud and one offense of Obstruction of Justice.

### Conclusion

The trial court did not commit reversible error or fundamental error in the admission of evidence and therefore we affirm the murder conviction. However, because Duvall's acts

18

constitute a single chargeable offense under the continuing crime doctrine, we affirm one conviction each for Insurance Fraud and Obstruction of Justice, but reverse and remand with instructions to vacate the remaining five convictions for Insurance Fraud and the remaining two convictions for Obstruction of Justice.

Affirmed in part, reversed in part, and remanded with instructions.

RILEY, J., and CRONE, J., concur.