**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| HENRY L. SHELL, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 52A02-1307-CR-598 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MIAMI CIRCUIT COURT
The Honorable Timothy P. Spahr, Judge
Cause No. 52C01-1012-FB-41

**July 14, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Henry L. Shell, Jr. appeals his convictions and sentence for class B felony neglect of a dependent, class D felony battery, and class A misdemeanor resisting law enforcement. Shell raises numerous issues for our review, none of which constitute reversible error. Accordingly, we affirm.

**Facts and Procedural History**

The facts most favorable to the verdict indicate that Shell and his wife Karen resided together with Karen's nine-month-old son, L.S. Although subsequent DNA tests revealed that L.S. was not Shell's biological son, at all relevant times, Shell believed that L.S. was his son. On November 27, 2010, Shell and Karen used methamphetamine several times by injecting it with hypodermic needles. The next morning, on November 28, 2010, Shell and Karen were arguing in their bedroom as L.S. sat on the bed. Shell picked up a metal fence pole that he kept beside the bed for protection and swung it at Karen. Shell hit Karen's arm with the pole. Shell swung the pole at Karen again, but when Karen ducked out of the way, Shell hit L.S. in the head with the pole.

Karen attempted to call 911 but her cell phone would not work. Shell and Karen took L.S. to Shell's sister Shirley's house nearby. L.S. was unresponsive and stiff, had shallow breathing, and had blood caked under his nose. Shirley heard Shell say that L.S. fell off the bed. Shirley heard Karen say something about a pole. Shirley's husband Timothy took L.S. and laid him on the couch while Shirley called 911. Shell was screaming, apologizing to L.S., and stating that he wanted to kill himself. Shell ran back to his house briefly and then

2

returned behaving frantically. Karen was hyper and frazzled and ran in and out of Shirley's house smoking cigarettes.

Emergency Medical Technician ("EMT") Jayme Hierholzer arrived on the scene. Hierholzer observed that L.S. was not moving or breathing well. Shell told Hierholzer that he would follow the ambulance as soon as he killed himself. As she examined L.S., Hierholzer asked Shell what happened to the baby and Shell stated that "he hit the bed and he didn't know L.S. was there." Tr. at 427. Hierholzer observed that L.S.'s pupils were fixed and dilated and that he had a bruise and swelling by his left temple.

When an ambulance and police officers arrived, Shell headed to the woods across the street. Converse Police Department Deputy Lee Mitchell photographed L.S.'s injuries and then went to the woods to locate Shell. When Deputy Mitchell found Shell, he identified himself as a police officer and told Shell that he needed to speak with him. Shell took off running. Deputy Mitchell chased after Shell, repeatedly ordering him to stop. Shell kept running while yelling, "I didn't do it. I didn't do anything. I'll kill you. I'll kill myself." *Id.* at 405. Deputy Mitchell finally caught up to Shell and ordered him to get on the ground. Shell refused to comply and charged at Deputy Mitchell. Deputy Mitchell deployed his taser. The taser did not deter Shell. Shell pulled the taser probes from his chest and again charged at Deputy Mitchell. Shell hit Deputy Mitchell on the right side of his face and behind his left ear, causing cuts. Deputy Mitchell fell to the ground, and Shell ran off. Miami County Sheriff's Deputy Jeff Williams subsequently arrived, and Deputy Mitchell got in a police

vehicle with him. The two officers eventually located Shell in a nearby residence and took him into custody.

Deputy Williams, who was trained as a certified drug recognition examiner, observed that Shell was exhibiting signs of someone who was under the influence of a central nervous system stimulant such as methamphetamine. Shell exhibited dilated pupils, profuse sweating, hyperactivity, and teeth grinding. After Deputy Williams transported Shell to the Indiana State Police post, Shell repeatedly muttered that he had "fucked up." *Id*. at 439.

L.S. was transported to the hospital by helicopter. Doctors determined that L.S. suffered a significant blow to his left temple which caused a subdural hematoma. Additional tests revealed that L.S. had multiple skull fractures. Riley Hospital pediatrician Dr. Veda Akerman treated L.S. after his injury. Dr. Akerman concluded that because of L.S.'s injury, his brain is largely liquid, he will not progress beyond his current infant level, he will need round-the-clock care for the rest of his life, and his life span is likely compromised due to the injury.

The State charged Shell with five criminal counts: count I, class B felony neglect of a dependent resulting in serious bodily injury; count II, class B felony battery resulting in serious bodily injury to a person less than fourteen years of age; count III, class D felony battery resulting in bodily injury; count IV, class D felony domestic battery; and count V, class A misdemeanor resisting law enforcement. A four-day jury trial began on May 20, 2013. The jury found Shell guilty of counts I, III, and V and not guilty of the remaining two

counts. Following a sentencing hearing, the trial court sentenced Shell to an aggregate sentence of twenty-one years. This appeal ensued.

**Discussion and Decision**

**Section 1 – Peremptory Challenge**

Shell first contends that the trial court erred by accepting the State's race-neutral explanation for its peremptory strike against the only African-American member of the jury venire. "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Addison v. State*, 962 N.E.2d 1202, 1208-10 (Ind. 2012) (quoting *Batson v. Kentucky*, 476 U.S. 79, 86 (1986)). We apply a three-part test to determine whether the State has improperly used a peremptory challenge to remove a potential juror from the venire solely because of that individual's race:

> First, the party contesting the use of a peremptory challenge must make a prima facie showing of discrimination based upon race against the member of the venire. Next, the party using a peremptory challenge may present a race-neutral explanation for using the challenge. If the party seeking to strike a member of the venire provides a race-neutral explanation, the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination.

*Thompson v. State*, 966 N.E.2d 112, 120 (Ind. Ct. App. 2012) (citation and quotation marks omitted), *trans. denied*.

The burden at the first stage of the analysis is low, only requiring the defendant to show circumstances raising an inference that discrimination occurred. *Addison*, 962 N.E.2d at 1208. Removal from the venire of the only African-American juror that could have served

5

on the petit jury is prima facie evidence of discriminatory intent and satisfies the initial burden under *Batson*. *Cartwright v. State*, 962 N.E.2d 1217, 1222 (Ind. 2012). Regarding the second step in the analysis, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Addison*, 962 N.E.2d at 1209 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)) (additional citation omitted). While the race-neutral reason "must be more than a mere denial of improper motive, the reason need not be particularly 'persuasive, or even plausible.'" *Id.* If the trial court is not persuaded by the race-neutral justification, it is during the third step of the analysis that "'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" *Id.* at 1210.

Due to the importance of the demeanor of potential jurors and the prosecutor when the trial court evaluates a race-neutral explanation for a peremptory challenge, we afford broad latitude to the trial court's decision in such matters. *Killebrew v. State*, 925 N.E.2d 399, 401 (Ind. Ct. App. 2010), *trans. denied*. We will set aside the trial court's decision concerning whether a peremptory challenge is discriminatory only if it is found to be clearly erroneous. *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001).

Here, Shell raised a *Batson* challenge to the State's use of a peremptory strike against Mr. Summers, the only African-American prospective juror. While questioning the jury venire, the deputy prosecutor informed the prospective jurors that he had tendered "a fairly significant list of names of everyone who might conceivably be called to testify in this case" but that he was not going to call some of those witnesses "simply because I don't think it's

6

necessary in order for us to present our story, our case, our evidence." Tr. at 287. He then asked, "Are you, any of you gonna have any problem with that, Mr. Summers, if I don't call some of those people?" *Id.* Summers responded in the affirmative.[1] The deputy prosecutor then asked Summers, "You want me to call them all?" *Id.* Summers responded, "Yeah, because a man's life is on the line basically." *Id.* at 288. In using a peremptory strike against Summers, the State explained:

> In this case, I ask, you know, if I, if the state decided it didn't need everyone on the witness list, would you still want all of the witnesses to be called, and he said yes, he did. We're not going to call all the witnesses. So that's gonna put the state at a disadvantage. One of two things. I have to, either have to know that he's not gonna decide it my way, uh, or I'm gonna have to call a whole bunch of witnesses that I don't think are necessary to prove the case.

*Id.* at 298. The deputy prosecutor pointed out that it had also struck a white juror who stated that she would want DNA evidence even when DNA evidence is unnecessary or inapplicable.

The trial court accepted the State's explanation and denied the *Batson* challenge. The court determined that the State's race-neutral explanation was plausible and "makes sense." *Id*. at 299. Specifically, the trial court noted that "if this individual is going to say every possible named witness from the state is going to need to be here, um, that's I think misunderstanding a certain fundamental concern, which is that the state doesn't have to call every possible witness in order to make its case." *Id*. The trial court found the State's race-neutral explanations credible, and there is nothing in the record to indicate that the State's

---

[1] Although the transcript indicates that Mr. Summers's response was "inaudible," it is evident from the record that he responded in the affirmative. Tr. at 287.

reasons were merely pretextual. Shell has not carried his burden to show purposeful discrimination. The trial court's decision in this regard is not clearly erroneous.

## Section 2 – Prosecutorial Misconduct

We next address Shell's multiple claims of prosecutorial misconduct, two of which were properly raised at the trial level and preserved for appellate review and one of which was not. In reviewing claims of prosecutorial misconduct that were properly raised in the trial court, we first determine whether misconduct occurred, and if so, we assess "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012) (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). The gravity of the peril is not measured by the degree of impropriety of the conduct, but rather by the probable persuasive effect of the misconduct on the jury's decision. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). To properly preserve a claim of prosecutorial misconduct, the defendant must ask the trial court, at the time the misconduct occurs, to admonish the jury or move for a mistrial if admonishment is inadequate. *Castillo*, 974 N.E.2d at 468.

In reviewing claims of prosecutorial misconduct that have been procedurally defaulted for failure to properly raise them in the trial court, the defendant must establish both the grounds for prosecutorial misconduct and the grounds for fundamental error. *Booher*, 773 N.E.2d at 818. Fundamental error is a narrow exception which places a heavy burden on the defendant to show alleged errors so prejudicial to the rights of the defendant that it renders a fair trial impossible. *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002). Indeed, our

8

supreme court recently held that to establish fundamental error, "the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm." *Ryan v. State*, No. 49S02-1311-CR-734, slip op. at 2 (Ind. Jun. 3, 2014) (citations and quotation marks omitted). The *Ryan* court implored "We stress that '[a] finding of fundamental error essentially means that the trial judge erred … by not acting when he or she should have ….'" *Id.* (quoting *Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012)).

### Section 2.1 – Properly Preserved Claims

Shell first alleges that the prosecutor committed misconduct by stating to the jury during voir dire that defense counsel's "check comes from the government too, so we all work for the government here." Tr. at 284. Shell objected to the comment, moved to strike the jury panel, and moved for a mistrial, and all of these requests were denied by the trial court. Shell argues that the comment improperly revealed to the jury that Shell was represented by a public defender, that his counsel "was representing him out of duty and not out of a belief in his innocence," and that his defense costs were being paid by taxpayers. Appellant's Br. at 28. Shell directs us to *Jackson v. State*, 698 N.E.2d 809, 812 (Ind. Ct. App. 1998), *trans. denied*, in which another panel of this Court concluded that a prosecutor's statement that "[p]ublic defenders are paid by the state" was indeed improper. However, we found no prosecutorial misconduct in *Jackson*, concluding that the trial court's subsequent admonishment to the jury cured any harm that may have been caused by the statement. Here,

in response to defense counsel's objection to the prosecutor's comment, the trial court offered to admonish the jury. Defense counsel declined the offer for an admonishment, arguing that an admonishment would merely highlight the comment to the jury and instead renewed his motion for a mistrial. The trial court denied the motion.

In deciding whether the extreme remedy of a mistrial is warranted, the trial court is in the best position to gauge the surrounding circumstances and the potential impact on the jury. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). On appeal, we afford great deference to the trial court's exercise of discretion in this regard. *Id*. As stated above, to prevail on appeal from the denial of a motion for mistrial in the context of prosecutorial misconduct, the appellant must establish that the challenged conduct was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Id*.

This challenged conduct did not rise to such level. It was an indirect and isolated comment that undoubtedly had little to no persuasive effect on the jury's ultimate decision. As stated, the gravity of the peril is not measured by the degree of impropriety of the conduct, but rather by the probable persuasive effect of the misconduct on the jury's decision. *See Booher*, 773 N.E.2d at 817. Shell has not shown that the trial court abused its discretion when it denied his motion for mistrial.

Shell next asserts that the prosecutor improperly commented on his post-arrest right to silence in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). During cross-examination, the prosecutor asked Shell if he was offered the opportunity to tell law enforcement his side of the story. Defense counsel objected to the question arguing that the prosecutor was

10

improperly referring to Shell's constitutional right to remain silent. The trial court sustained the objection. The prosecutor then asked, "Mr. Shell, have we ever heard this story before?" Tr. at 657. After Shell responded in the negative, the prosecutor followed up with, "Not until today?" *Id*. Defense counsel again objected and moved to strike. The trial court initially granted the motion to strike, but then determined that Shell had not answered the objected-to question so that there was no answer to strike. Finally, later during cross-examination, and in the presence of the jury, the prosecutor informed the trial court that he wished to finish Shell's cross-examination the next morning explaining, "I had never heard this story before. Never. And to prepare for a cross-examination on a story that you've never heard before is a little difficult." *Id*. at 662. During a sidebar conference, Shell again objected to the prosecutor's reference and the trial court sustained the objection. There is no indication in the record that defense counsel requested an admonishment or moved for a mistrial.[2]

"In *Doyle*, the United States Supreme Court held that under the Fourteenth Amendment a prosecutor may not use the silence of a defendant who has been arrested and Mirandized to impeach the defendant." *Trice v. State*, 766 N.E.2d 1180, 1182 (Ind. 2002). However, even assuming the prosecutor's comments here were improper, *Doyle* violations may be deemed harmless if it is clear beyond a reasonable doubt that the violations did not contribute to the defendant's conviction. *Kubsch v. State*, 784 N.E.2d 905, 914 (Ind. 2003). In determining whether a *Doyle* violation is harmless beyond a reasonable doubt, we examine

---

[2] Because the record is somewhat unclear regarding whether this prosecutorial misconduct claim was properly preserved for appellate review, we will proceed to address the alleged *Doyle* violations in terms of a harmless error analysis.

11

five factors: (1) the use to which the prosecution puts the post-arrest silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the availability to the trial court of an opportunity to grant a motion for mistrial or give a curative instruction. *Id.* at 915.

After reviewing the record in light of the above factors, we conclude that any error here was harmless beyond a reasonable doubt. First, the prosecutor's references were not overly intense or frequent in the context of the entire trial, and defense counsel interjected with sustained objections on each occasion reducing the harm of any impact on the jury. Moreover, as explained more fully below, there was a substantial quantum of other evidence indicative of Shell's guilt. It is clear beyond a reasonable doubt that any error in the prosecutor's references to Shell's post-arrest silence did not contribute to his convictions. *See Sobolewski v. State*, 889 N.E.2d 849, 858 (Ind. Ct. App. 2008) (holding that State's use of defendant's silence was harmless beyond a reasonable doubt), *trans. denied*.

### Section 2.2 – Waived Claim

Shell also contends that the prosecutor committed misconduct during closing argument. Specifically, the prosecutor stated:

> We've shown you a Day in the Life of [L.S.] video, what his life consists of. His little prison in his wheelchair and his bed. And I told you that was all the result of the actions of Henry Lee Shell and his mother, and let's not forget, I include his mother in that. I stand by that statement 100%. I have seen or heard nothing that changes my opinion.

Tr. at 691. Shell asserts that the prosecutor improperly injected his personal opinion as to Shell's guilt and also invited a verdict based upon the jury's sympathy for a severely

incapacitated child. Shell concedes that he did not object to this statement, request an admonishment, or move for a mistrial. Thus, he relies on the fundamental error doctrine

As has been observed by our supreme court, "[s]everal Indiana cases have rejected fundamental error claims with respect to closing arguments more extreme than those made [in] this case." *See Carter v. State*, 738 N.E.2d 665, 677 (Ind. 2000) (reviewing Indiana case law and finding no fundamental error regarding prosecutor's closing argument alleged to have improperly invoked sympathy for victim and improperly commenting on the defense attorney's function) (citations omitted). Regardless of the propriety of the prosecutor's statements during closing argument here, we cannot say that the statements constituted "clearly blatant violations of basic and elementary principles of due process" that presented an "undeniable and substantial potential for harm." *Ryan*, No. 49S02-1311-CR-734, slip op. at 2. More specifically, we are unable to conclude that the statements subjected Shell to such grave peril that the trial judge erred in not acting sua sponte in response. *See id.* Shell has not established fundamental error.

### Section 3 – Admission of Evidence

Shell next contends that the trial court abused its discretion when it admitted into evidence State's Exhibits 48 and 55. "A trial court has broad discretion in ruling on the admission or exclusion of evidence." *Palilonis v. State*, 970 N.E.2d 713, 726 (Ind. Ct. App. 2012), *trans. denied*. "An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented." *Id.* When reviewing the admissibility

of evidence, we do not reweigh evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009).

State's Exhibit 48 consisted of a "day in the life" videotape depicting L.S.'s current medical condition. Appellant's Br. at 33. State's Exhibit 55 consisted of a videotaped deposition of Dr. Ackerman, the Riley Hospital pediatrician who evaluated L.S. after his injury. Shell objected to the admission of both exhibits, arguing that the prejudicial value of the exhibits outweighed their probative value.[3] Shell maintains that the trial court should have excluded the evidence because the videotapes were inflammatory and "cumulative to substantial other evidence revealing L.S.'s tragic circumstances." Appellant's Br. at 33.

We have explained,

> Indiana Evidence Rules 401 through 403 govern relevancy of evidence. Relevant evidence is admissible; irrelevant evidence is not. Ind. Evidence Rule 402. Evidence is relevant if it has any tendency to make any "fact that is of consequence to the determination" of the action more or less probable. Ind. Evidence Rule 401. Relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ind. Evidence Rule 403.

*Jackson v. State*, 973 N.E.2d 1123, 1127 (Ind. Ct. App. 2012), *trans. denied.* "All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that evidence." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012), *trans. denied* (2013). In determining the likely unfair prejudicial

---

[3] Shell also filed a motion in limine requesting exclusion of the exhibits which was denied by the trial court.

14

impact, courts look for the dangers that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury. *Id*. The trial court has wide latitude in weighing the probative value of evidence against the possible prejudicial impact of its admission. *Freed v. State*, 954 N.E.2d 526, 531 (Ind. Ct. App. 2011).

Here, it is clear that an evaluation of L.S.'s medical condition after the injury and information regarding his current condition and quality of life are highly relevant to the serious bodily injury element of two of Shell's charged crimes and the prolonged and catastrophic impairment suffered by L.S. As noted by the trial court, in her brief videotaped deposition, Dr. Ackerman "dispassionately" explains her medical evaluation of L.S. Tr. at 352. The "day in the life" videotape is less than four minutes long and simply depicts the reality of L.S.'s current medical condition. Again, as noted by the trial court, there is "no spoken commentary" with the video, and there is "certainly nothing gory or graphic about it." *Id*. Under the circumstances, we agree with the trial court that the relevance of this information was not substantially outweighed by the danger of unfair prejudice. That is to say, it is unlikely that the jury would substantially overestimate the value of the evidence. Therefore, we conclude that the trial court did not abuse its discretion in admitting State's Exhibits 48 and 55.

### Section 4 – Jury Instruction

Shell asserts that the trial court abused its discretion when it refused his proposed jury instruction defining reasonable doubt. The purpose of jury instruction is to inform the jury of

the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Fowler v. State*, 900 N.E.2d 770, 773 (Ind. Ct. App. 2009). When evaluating a trial court's rejection of a tendered instruction, we look to: (1) whether the tendered instruction correctly states the law, (2) whether there is evidence in the record to support giving the instruction, and (3) whether the substance of the proffered instruction is covered by other instructions. *Short v. State*, 962 N.E.2d 146, 150 (Ind. Ct. App. 2012). As a general rule, instruction of the jury lies with the sound discretion of the trial court and is reviewed only for an abuse of that discretion. *Gravens v. State*, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005), *trans. denied* (2006).

The reasonable doubt jury instruction submitted by Shell provided, "A reasonable doubt may arise from the evidence, or from a lack of evidence, or from a conflict in the evidence on or concerning a given fact or issue." Appellant's App. at 147, 212. The trial court rejected the instruction, concluding that the substance of the instruction was covered by other instructions. Tr. at 246-247, 676. First, as observed by the trial court, the reasonable doubt instruction that was read to the jury and many of the other jury instructions were pattern jury instructions, this being the preferred practice. *See Gravens*, 836 N.E.2d at 493 (noting that the preferred practiced is to use pattern jury instructions because they have apparent approval of our supreme court) (citations omitted).

Moreover, jury instructions are to be considered as a whole and in reference to each other, not in isolation. *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010).

16

Upon review of the whole of the jury instruction here, we agree with the trial court that the substance of Shell's tendered instruction was adequately covered by other jury instructions, and therefore the jurors were adequately instructed regarding reasonable doubt and their ability to decide conflicts in the evidence. We disagree with Shell that his proposed instruction was imperative or that it was an abuse of discretion to reject it. Simply put, the instructions as a whole did not misstate the law or otherwise mislead the jury. *See id.* ("To constitute an abuse of discretion, the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury.") Accordingly, the trial court did not abuse its discretion in refusing Shell's tendered reasonable doubt instruction.

## Section 5 – Sufficiency of the Evidence

Shell next challenges the sufficiency of the evidence to sustain his conviction for class B felony neglect of a dependent. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied.* We neither reweigh the evidence nor assess witness credibility. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence, and we will affirm the defendant's conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003).

Indiana Code Section 35-46-1-4(a)(1) provides that "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally … places the dependent in a situation that endangers the dependent's life or health" commits neglect of a dependent, a class D felony." The offense becomes a class B felony if it results in serious bodily injury. Ind. Code § 35-46-1-4(b)(2). As charged in the amended information, the State alleged that on November 28, 2010, Shell, having the care of L.S., used methamphetamine around the child and/or participated in a violent physical confrontation with the mother of the child, in the presence of the child, the force and combination of which resulted in serious bodily injury (a fractured skull) to L.S. Appellant's App. at 93, 97.

In challenging the sufficiency of the evidence, Shell argues that the State failed to prove that he used methamphetamine around L.S. or that he participated in a violent and physical confrontation with Karen in the presence of L.S. which endangered L.S.'s life or health and resulted in serious bodily injury. Specifically, Shell argues that the only evidence presented regarding his alleged methamphetamine use or a violent altercation came from Karen and that her testimony was incredibly dubious. Shell's reliance on the incredible dubiosity rule is misplaced.

Pursuant to the incredible dubiosity rule, this Court may impinge upon the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony. *Manuel v. State*, 971 N.E.2d 1262, 1271 (Ind. Ct. App. 2012). Application of the rule is very narrow

and permitted only "where a sole witness presents inherently contradictory testimony that is equivocal or coerced and there is a lack of circumstantial evidence of guilt." *Turner v. State*, 953 N.E.2d 1039, 1059 (Ind. 2011). Contradiction between witnesses' testimony does not make evidence incredible under this rule. *See Stephenson v. State*, 742 N.E.2d 463, 497 (Ind. 2001).

Our review of Karen's testimony reveals that, although difficult to understand at times, it was neither inherently contradictory nor equivocal or coerced. In addition, contrary to Shell's assertions, Karen's testimony was not the only evidence to support his conviction, as the State presented ample circumstantial evidence of Shell's guilt. Regarding Shell's alleged methamphetamine use, Deputy Williams testified that, as a "certified drug recognition examiner," he observed Shell's physical appearance and behavior shortly after the incident as indicative of someone under the influence of a central nervous system stimulant such as methamphetamine. Tr. at 439. Karen's claim that she and Shell had a physical altercation that endangered L.S. was substantiated by photographs of bruising on her arm that she stated were caused when Shell first hit her with the metal pole. Corroboration of Karen's claim that Shell hit L.S. in the head with a metal pole came from medical evidence that L.S.'s injuries could have resulted from a single powerful blow to the head. EMT Hierholzer helped corroborate that Shell was the perpetrator of the blow when she testified that she asked Shell how L.S. was injured and Shell told her that "he hit the bed and he didn't know L.S. was there." *Id*. at 427. Finally, in addition to the aforementioned testimony, the jury heard evidence that Shell fled from and resisted law enforcement that responded to the

scene. "Evidence of flight may be considered as circumstantial evidence of consciousness of guilt." *Brown v. State*, 563 N.E.2d 103, 107 (Ind. 1990).

In sum, Karen's testimony was not incredibly dubious, and Shell's additional challenges to her credibility and to the strength of the circumstantial evidence of his guilt are merely invitations for us to reweigh the evidence in his favor, which we may not. The State presented sufficient evidence to sustain Shell's conviction for class B felony neglect of a dependent.

### Section 6 – Appropriateness of Sentence

Shell requests that we exercise our discretion to reduce his twenty-one year aggregate sentence. Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this Court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). We should "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* Appellate review and revision ultimately boils down to the appellate court's "collective sense of what is appropriate, not a product of a deductive reasoning process." *Id.*

When considering the nature of the offense, the advisory sentence is the starting point to determine the appropriateness of a sentence. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. Shell was convicted of a class B felony neglect of a dependent, class D felony battery, and class A misdemeanor resisting law enforcement. The sentencing range for a class B felony is six to twenty years, with an advisory sentence of ten years. Ind. Code § 35-50-2-5. The sentencing range for a class D felony is six months to three years, with an advisory sentence of one and one-half years. Ind. Code § 35-50-2-7. The sentencing range for a class A misdemeanor is up to one year in prison. Ind. Code § 35-50-3-2. Shell's twenty-one-year sentence is three years below the maximum aggregate sentence for his crimes.

Regarding the nature of the offenses, while his battery against Woods was not particularly egregious, we cannot say the same for Shell's other offenses. Most significantly, Shell's neglect of a dependent has resulted in unimaginable tragedy. Shell's acts did not merely result in serious bodily injury to L.S., but left the baby in a persistent vegetative state. As for his resisting law enforcement offense, the record indicates that Shell not only resisted law enforcement, but also assaulted and injured the officer who was attempting to subdue him. The nature of these offenses does not warrant a sentence reduction.

Regarding his character, Shell has a significant criminal history spanning twenty-nine years and consisting of five felony convictions and nine misdemeanor convictions. While Shell emphasizes that many of his prior crimes were related to his substance abuse and addiction, we note that Shell has been repeatedly granted drug rehabilitation opportunities

21

and probation leniencies, yet he has refused to lead a law-abiding and drug-free life. Indeed, Shell committed the current offenses while released on bond for dealing in methamphetamine and theft charges. His poor character is evident in his continued poor choices. Under the circumstances, Shell has fallen short of persuading us that his twenty-one-year sentence is inappropriate in light of the nature of his crimes or his character. Accordingly, we affirm the trial court in all respects.

Affirmed.

BAKER, J., and BARNES, J., concur.