## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 24 2020, 10:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Paul G. Stracci
J. Michael Woods
Stracci Law Group, P.C.
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jerome Wilderness, Sr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 24, 2020 <br><br> Court of Appeals Case No. <br> 20A-CR-88 <br><br> Appeal from the <br> Lake Superior Court <br><br> The Honorable <br> Salvador Vasquez, Judge <br><br> Trial Court Cause No. <br> 45G01-1802-MR-1 |

**Kirsch, Judge.**

Jerome Wilderness, Sr. ("Wilderness") was convicted after a jury trial of murder,[1] a felony, and was sentenced to an aggregate sentence of fifty-five years executed. He appeals his conviction and raises several issues, which we consolidate and restate as:

> I. Whether the trial court abused its discretion in the admission and exclusion of certain evidence during the trial;
>
> II. Whether the trial court abused its discretion when it denied Wilderness's request for a mistrial;
>
> III. Whether the trial court committed fundamental error in its final jury instructions concerning self-defense;
>
> IV. Whether statements made in the State's rebuttal closing argument constituted prosecutorial misconduct that rose to the level of fundamental error; and
>
> V. Whether fundamental error occurred due to the cumulative effect of the errors.

We affirm.

## Facts and Procedural History

In February 2018, Wilderness, who was sixty-five years old at the time, lived in a house in Crown Point, Indiana with his wife, Patricia, and his son, Jerome

---

[1] *See* Ind. Code § 35-42-1-1(1).

Wilderness, Jr. ("Junior"), who was living with his parents at the time because he was going through a divorce. *Tr. Vol. 3 at 235; Tr. Vol. 5 at 215-16.* Junior had ten-month-old twin daughters, who would come to the home when Junior had parenting time. *Tr. Vol. 3 at 233; Tr. Vol. 5 at 133-34.*

[4] On February 17, 2018, Junior was at the residence with his daughters. *Tr. Vol. 5 at 111-13.* At 9:13 p.m. that night, Lake County 911 received a call from Wilderness reporting that "he shot his son three times." *Tr. Vol. 4 at 60, 67-68; Tr. Vol. 5 at 171.* While speaking with the 911 operator, Wilderness stated that Junior's breathing was slowing and that he thought his son was going to die. *Tr. Vol. 5 at 174.* At one point, Wilderness said he thought Junior had stopped breathing. *Id.* The 911 operator asked Wilderness if he wanted to perform CPR on Junior, and Wilderness responded, "no." *Id.*

[5] In response to the 911 call, police were dispatched to the home of Wilderness. *Tr. Vol. 4 at 54, 91, 115.* When they arrived, Wilderness exited the residence with his hands in the air and was detained while the police could assess the scene. *Id.* at 56-57, 117. Inside the house, officers found Junior and his infant daughters at the bottom of the basement stairs. *Id.* at 93, 99, 118. Two revolvers were sitting at the top of the stairs leading to the basement. *Id.* at 118. When the officer began to attend to Junior, he told them, "Help. . . . I'm dying. Help me. I'm dying." *Id.* at 93. One officer checked Junior's wounds and fastened a tourniquet, while a second officer took care of the infants. *Id.* at 93-95. The paramedics soon arrived and took over tending to Junior. *Id.* at 69-70. After providing Junior with oxygen and intravenous fluids, the paramedics

transported him to the hospital. *Id*. at 76. During the trip to the hospital, Junior's condition deteriorated, and the paramedics twice had to use needles to decompress his right lung. *Id*. at 77-78.

[6] Once at the hospital, Junior was taken into emergency surgery but died during the surgery. *Tr. Vol. 5* at 117. An autopsy was performed, during which four gunshot wounds were identified, and three bullets were recovered from Junior's body. *Tr. Vol. 3* at 244; *Tr. Vol. 4* at 11-13. The first gunshot wound was a "through-and-through gunshot wound" passing through Junior's right hand with gunpowder stippling around the wound. *Tr. Vol. 4* at 15-18. The stippling indicated that the gun was fired at close range, and the pathologist described this as a defensive wound consistent with Junior "attempting to protect himself by pushing" away the gun. *Id*. at 16, 22, 33. That bullet apparently then entered Junior's upper chest and lodged into his right shoulder area. *Tr. Vol. 4* at 19, 23, 28. The second bullet was recovered from Junior's left thigh, and the third bullet entered his abdomen and passed through the diaphragm, liver, and right lung before stopping in his back muscle, causing his death. *Id*. at 14, 20. It was later confirmed that all three bullets were fired from Wilderness's revolver. *Id*. at 24.

[7] After he was arrested, Wilderness made a statement to police in which he again admitted to shooting Junior. *Tr. Vol. 5* at 175. Wilderness also told the officers that Junior did not possess any weapons and did not have one the night of the murder. *Id*. Wilderness additionally told the police that Junior had not punched him prior to the shooting. *Id*. at 177.

[8] In their investigation, the police recovered a voicemail from the phone of Marisa Wilderness ("Marisa"), Junior's sister and the daughter of Wilderness. *Tr. Vol. 4* at 158; *Tr. Vol. 5* at 63, 118; *State's Ex.* 210. The voicemail had been sent by Junior at 8:58 p.m. on the night of the murder and was approximately two-and-a-half minutes in length. *Tr. Vol. 5* at 47-56; *State's Ex.* 210. The recording captured some of the interactions between Wilderness and Junior around the time of the shooting. *State's Ex.* 210. On the recording, Junior can be heard yelling at his father, "Shoot me, N*****, shoot, shoot, shoot, shoot!" *Id*. at 00:28-33. Wilderness can be heard stating, "get out of my house, boy." *Id*. at 2:26-28.

[9] On February 20, 2019, the State charged Wilderness with murder and later, on May 1, 2019, added an enhancement for use of a firearm. *Appellant's App. Vol. II* at 30, 109. Prior to Wilderness's trial, the State filed notice that it intended to present evidence, under Indiana Evidence Rule 404(b), of an incident that occurred on January 13, 2018 ("the January incident"), where Wilderness became angry during a discussion of Junior's divorce, produced a firearm from his pocket, pointed it at Junior, and made verbal threats. *Id*. at 97-98.[2] Following a hearing on the State's notice, the trial court granted the State's request to present 404(b) evidence but later clarified that the evidence would only be admissible if Wilderness put his intent at issue. *Id*. at 107; *Tr. Vol. 2* at

---

[2] The State initially filed two notices regarding evidence under Evidence Rule 404(b) but then discovered that the witnesses were describing a single event. *Appellant's App. Vol. II* at 97-104; *Tr. Vo. 2* at 3-4.

41.  At trial, the trial court found that Wilderness's opening statement raised self-defense and put his intent at issue, and, therefore, the State could introduce the 404(b) evidence.  *Tr. Vol. 3* at 227-31; *Tr. Vol. 5* at 93-96.

[10]  Prior to trial, Wilderness also filed a motion in limine, seeking to exclude the recording of Junior's voicemail to Marissa from the night of the murder because the recording was of such poor quality that it would cause the jury to speculate as to its contents.  *Appellant's App. Vol. II* at 121-22.  The trial court reviewed the recording out of the presence of the jury and denied Wilderness's motion, finding "that there are enough intelligible portions to be helpful to this jury."  *Tr. Vol. 4* at 47-48.  The trial court also rejected a request to redact unintelligible parts of the recording.  *Id*. at 50-51.

[11]  The jury trial commenced on November 4, 2019.  Wilderness testified in his defense and claimed that Junior "just kind of like went off" after Wilderness asked him about not answering the door when Marissa had stopped by earlier that day.  *Tr. Vol. 5* at 228.  Wilderness testified that Junior became upset, blocked Wilderness's movement, and that they "tangled a little bit" with Junior pushing Wilderness to the floor in the kitchen.  *Id*. at 230-31.  Wilderness also described a second confrontation a short time later in the living room where he repeatedly told Junior to "get out," and Junior again grabbed him and pushed him to the ground before going down to the basement.  *Id*. at 234-35.  Wilderness stated that he then started to call the police but hung up because he did not "want to make things worse for [his] son."  *Id*. at 236-37.  Wilderness testified that he then confronted his son in the basement, telling him "you gotta

go." *Id*. at 237.  According to Wilderness, Junior "grabbed [him] again" and pushed him down, breaking a table.  *Id*. at 237-38.  When Junior then started to come toward him again, Wilderness, who stated that he carried two pistols on his person, grabbed the pistol he kept on his right side.  *Id*. at 238.  Wilderness testified that Junior "kept coming," "got on top" of Wilderness, and "tried to grab" the gun from him.  *Id*.  Wilderness testified that he thought Junior "might take" the gun from Wilderness and shoot him, so he then fired the gun three times while Junior "was over the top of" him but denied that he was aiming at Junior.  *Id*. at 239.

[12]  Based on Wilderness's claim of self-defense, the trial court provided two self-defense final jury instructions which were instructions that the trial court had "been using for many many years."  *Id*. at 187; *Tr. Vol. 6* at 23; *Appellant's App. Vol. II* at 155-56.  Wilderness did not object to these final instructions on self-defense or to any of the trial court's other final instructions.  *Tr. Vol. 6* at 27.  The State requested an instruction on voluntary manslaughter, but Wilderness objected, arguing the evidence did not indicate that Wilderness was excited at the time of the crime, and the trial court denied the request for a voluntary manslaughter instruction.  *Id*. at 25-27.

[13]  At the conclusion of the trial, the jury found Wilderness guilty of murder.  *Id*. at 91; *Appellant's App. Vol. II* at 169.  Wilderness waived his right to a jury trial on the firearm enhancement and pleaded guilty to the enhancement.  *Appellant's App. Vol. II* at 170.  On December 11, 2019, the trial court sentenced Wilderness to fifty years in the Indiana Department of Correction for his murder conviction

and a five-year enhancement for use of a firearm, resulting in an aggregate sentence of fifty-five years. *Id*. at 188-89. Wilderness now appeals.

# Discussion and Decision

## I.     Admission and Exclusion of Evidence

[14]    The admission and exclusion of evidence rests within the sound discretion of the trial court, and we review the exclusion of evidence only for an abuse of that discretion. *Griffith v. State*, 31 N.E.3d 965, 969 (Ind. 2015). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances presented. *Barnhart v. State*, 15 N.E.3d 138, 143 (Ind. Ct. App. 2014). "Even if a trial court errs in its evidentiary ruling, 'we will not overturn the conviction if the error is harmless.'" *Griffith*, 31 N.E.3d at 969 (quoting *Appleton v. State,* 740 N.E.2d 122, 124 (Ind. 2001) (citations omitted)). "An error is harmless if 'the probable impact of the evidence upon the jury is sufficiently minor so as not to affect a party's substantial rights.'" *Id*. (quoting *Appleton*, 740 N.E.2d at 124). The trial court's ruling will be sustained on any reasonable basis apparent in the record, whether or not relied on by the parties or the trial court. *Washburn v. State*, 121 N.E.3d 657, 661 (Ind. Ct. App. 2019) (citing *Jeter v. State*, 888 N.E.2d 1257, 1267 (Ind. 2008), *cert. denied,* 555 U.S. 1055 (2008)), *trans. denied*.

### A. 404(b) Evidence

[15]    Wilderness argues that the trial court abused its discretion when it admitted evidence of the January incident in which Wilderness became angry during a

discussion of Junior's divorce, produced a firearm and pointed it, and made verbal threats, under Indiana Evidence Rule 404(b) because the evidence did not prove motive or intent or show the relationship between Wilderness and Junior, and, instead, only showed that Wilderness had a violent relationship with his family and a propensity to commit violence against Junior. Wilderness further contends that the evidence of the January incident should not have been admitted. He argues that there was insufficient evidence to show that it was relevant to the relationship between him and Junior, and, specifically, that there was not sufficient evidence that the conversation from the January incident concerned Junior's divorce or that Wilderness threatened Junior. He also contends that the evidence regarding the January incident was unfairly prejudicial because the jury could infer from the evidence that he had the propensity to do violence to his family and acted in conformity therewith when he shot Junior.

[16] Indiana Evidence Rule 404(b) prohibits a trial court from admitting evidence of another crime, wrong, or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evidence Rule 404(b)(1). "The purpose of the rule is to protect against the 'forbidden inference -- that the defendant acted badly in the past, and that the defendant's present, charged actions conform with those past bad acts . . . .'" *Erickson v. State*, 72 N.E.3d 965, 973-74 (Ind. Ct. App. 2017) (quoting *Nicholson v. State*, 963 N.E.2d 1096, 1099-100 (Ind. 2012) (citation omitted)), *trans. denied*. Evidence of crimes, wrongs, or other acts are

admissible if offered for another purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). In assessing the admissibility of 404(b) evidence, we: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Erickson*, 72 N.E.3d at 974.

[17] In the present case, the State sought to introduce evidence from the January incident in which Wilderness was present at a family meeting along with other family members including Junior, and a discussion occurred regarding what actions Junior should take in his divorce. *Appellant's App. Vol. II* at 97-98; *Tr. Vol. 3* at 228. At the meeting, Wilderness became angry about what was being said and produced a Smith and Wesson .38 caliber handgun from his pocket, pointed the firearm at one of the family members, and made verbal threats. *Appellant's App. Vol. II* at 97-98; *Tr. Vol. 3* at 228. The State stated that it was offering the evidence of the January incident for various permissible purposes including Wilderness's motive and intent. *Appellant's App. Vol. II* at 97-98. The trial court initially granted the State's request to present 404(b) evidence, but then clarified that the evidence would be admissible only if Wilderness put his intent at issue. *Id*. at 107; *Tr. Vol. 2* at 41. At trial, the trial court found that Wilderness's opening statement raised a claim of self-defense and put his intent at issue, and, therefore, the State could introduce the 404(b) evidence. *Tr. Vol. 3* at 227-31; *Tr. Vol. 5* at 93-96.

[18] "Evidence of motive is always relevant in the proof of a crime, and a defendant's prior actions with respect to the victim are also usually admissible to show the relationship between the two." *Fry v. State*, 748 N.E.2d 369, 372 (Ind. 2001). The intent exception is narrowly construed and is available only "when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent." *Fairbanks v. State*, 119 N.E.3d 564, 569 (Ind. 2019) (citing *Wickizer v. State*, 626 N.E.2d 795, 799 (Ind. 1993)), *cert. denied*, 140 S. Ct. 198 (2019). The exception is available when a defendant's claim of contrary intent is alleged in the opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief. *Id*.

[19] The evidence of the January incident, which related to Junior's pending divorce and occurred during his parenting time when the twins were present, was relevant to understand Wilderness's intent and motive to shoot and kill Junior. The January incident involved a situation where Junior's divorce was being discussed during a visitation with Junior's twins. Wilderness became angry, displayed his gun, pushed Patricia down, and made threats to "end it" and "kill us all," directed to everyone present including Junior. *Tr. Vol. 5* at 103-06, 127-31. This evidence created a reasonable inference that Wilderness had already threatened and contemplated killing Junior and that his intent and motive for the subsequent killing one month later were based on the same matters involved in the January incident, namely, Junior's divorce issues, that caused the prior threat. This evidence was relevant and probative in that it showed that

Wilderness and Junior had a contentious relationship in which Wilderness became angry when discussing Junior's divorce and made threats while brandishing a firearm. Evidence of prior crimes and misconduct that tends to show a hostile relationship between the defendant and the victim is admissible. *See Evans v. State*, 727 N.E.2d 1072, 1080 (Ind. 2000) (finding that evidence of prior bad acts was relevant and probative in that it showed the defendant's relationship with the victim); *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) (finding that a prior incident where defendant argued with victim and threatened her was admissible because it was indicative of defendant's relationship with victim and highly relevant for his motive to shoot her). Additionally, evidence of a prior threat involving similar circumstances and victims has been found admissible to rebut claims of self-defense. *See Evans*, 727 N.E.2d at 1080 (other misconduct evidence admissible where defendant claimed self-defense); *Sanders v. State*, 704 N.E.2d 119, 124 (Ind. 1999) (other misconduct evidence admissible to rebut self-defense claim); *Goldsberry v. State*, 821 N.E.2d 447, 456 (Ind. Ct. App. 2005) (prior evidence of misconduct admissible where defendant raised self-defense claim in opening argument).

[20] Here, in admitting the evidence of the January incident, the trial court observed that this case is similar to *Evans*. *Tr. Vol. 5* at 99-100. In *Evans*, the defendant went to his ex-girlfriend's home, and while she and her new boyfriend were in bed, he began stabbing at her with a knife, asking her "Is that the reason you won't take me back?" 727 N.E.2d at 1076. Evans and the boyfriend began to fight, which led to Evans stabbing and killing the boyfriend. *Id*. Evans claimed

self-defense and argued that the boyfriend was the initial aggressor. *Id*. at 1078-79. The Supreme Court found the State properly introduced evidence under the intent exception of Evidence Rule 404(b) that Evans had choked his ex-girlfriend two days before the incident in question after she ended their relationship. *Id*. at 1080. Because the defendant "went beyond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent – self-defense," the Court found the prior conduct relevant because it rebutted the Evans's claim that the victim was the initial aggressor. *Id*.

[21] We agree with the trial court's reasoning and reject Wilderness's contention that *Evans* is "critically distinguishable" from the present case because here Patricia, and not Junior, "was the alleged victim of the [prior] physical bad acts." *Appellant's Br*. at 20-21. Contrary to Wilderness's assertion, Junior was a victim of the prior threat because Junior was present in the room when Wilderness brandished his gun and threatened to "kill [them] all" and to "end it." *Tr. Vol. 5* at 105-06, 127-31. The January incident showed that Wilderness had a volatile relationship with Junior prior to the murder and supported an inference that his motive and intent to harm Junior were related to the issues concerning Junior's pending divorce. *Evans* is similar to the present case in that it shows that the prior incident need not be identical to be probative of intent. In *Evans*, the Supreme Court found that the evidence of a previous act of choking the ex-girlfriend was probative and relevant to the killing of her new boyfriend because it rebutted that the claim that victim was the initial aggressor

and showed the defendant's intent at the time of the murder. *Evans*, 727 N.E.2d 1078-80.

[22] We also reject Wilderness's contention that the foundational evidence of the January incident was not sufficient to establish its relevancy. When presenting 404(b) evidence, there must be sufficient proof from which a reasonable jury could find the uncharged conduct proven by a preponderance of the evidence. *Caldwell v State*, 43 N.E.3d 258, 264 (Ind. Ct. App. 2015) (citing *Camm v. State*, 908 N.E.2d 215, 224 (Ind. 2009)), *trans. denied*. Here, the State met this requirement by presenting testimony from both Patricia and Marisa describing the January incident and Wilderness's actions and prior threats. *Tr. Vol. 5* at 103-06, 127-31. Although there were minor differences in their recollection of the January incident, both testified that Wilderness threatened his family while brandishing a gun, and Marissa specifically testified that the prior threat occurred during a discussion of Junior's divorce. *Id*. at 105-06, 128-31. The trial court was well within its discretion to find the January incident was proven by a preponderance of the evidence.

[23] We must next balance the probative value of the evidence against its prejudicial effect. Indiana Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" "When determining any unfair prejudicial impact, courts should look for the dangers that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury." *Bell v.*

*State*, 29 N.E.3d 137, 142 (Ind. Ct. App. 2015) (citing *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012), *trans. denied*), *trans. denied*. Determination of whether the probative value of an evidentiary matter is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court. *Id.*

[24] Wilderness contends that the evidence of the January incident was overly prejudicial because it could have caused the jury to speculate that he had a propensity to make threats. We disagree. When the trial court admitted the evidence, it limited the questioning to the January incident and the fact that, on that date, Wilderness made threats to the family members present while armed with a handgun. *Tr. Vol. 5* at 94-96. The trial court also rejected all questions from the jury that suggested that other incidents may have occurred. *Id.* at 150-51. We further conclude that the prejudice was not exacerbated when a police officer testified to recognizing Wilderness from prior calls. *Tr. Vol. 4* at 115-16. After Wilderness objected to the officer's statement, and the objection was sustained, there was no further mention of any prior calls. *Id.* No additional evidence was presented as to the nature of the prior calls or Wilderness's interactions with police, and Wilderness did not request any admonishment after objecting. *Id.* at 117.

[25] The evidence of the January incident was probative of the contentious relationship between Wilderness and Junior and was relevant to show Wilderness's motive and intent when he shot Junior. The challenged evidence involved a threat to Junior while Wilderness was armed with a firearm and

related to Junior's pending divorce. Although Wilderness argues that the January incident was not really about his anger concerning Junior's divorce, the trial court was well within its discretion to find the events were related based on the similar circumstances and available testimony. The probative value of the testimony of the January incident was not substantially outweighed by the danger of unfair prejudice, and the trial court did not abuse its discretion in admitting testimony of the January incident.

[26] Finally, any error in the admission of the January incident evidence was harmless. Errors in the admission of evidence are ordinarily disregarded as harmless unless they affect the substantial rights of a party. *Remy v. State*, 17 N.E.3d 396, 401 (Ind. Ct. App. 2014) (citing *Hoglund v. State,* 962 N.E.2d 1230, 1238 (Ind. 2012)), *trans. denied*. In determining whether a party's substantial rights have been affected, we consider the evidence's probable impact on the factfinder. *Id.* "Improper admission of evidence is harmless error 'if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction.'" *Id.* (quoting *Hoglund,* 962 N.E.2d at 1238).

[27] Here, Wilderness admitted to shooting Junior and refused a claim of sudden heat; therefore, the only question before the jury was whether he acted in self-defense. The evidence showed that Junior was unarmed and had no history of violence. *Tr. Vol. 5* at 249; *Tr. Vol. 6* at 20-21. The pathologist testified that Junior suffered what was described as a defensive wound consistent with Junior "attempting to protect himself by pushing" away the gun. *Tr. Vol. 4* at 22, 33.

Further, the voicemail recording showed that the shooting occurred approximately ten minutes before Wilderness called 911, and the State argued that this lapse in time coupled with the state of the house when the police arrived was consistent with Wilderness fabricating evidence of a struggle before calling 911. *State's Exs.* 11-153, 210; *Tr. Vol. 5* at 171; *Tr. Vol. 6* at 34-38. We, therefore, conclude that any error in admitting evidence of the January incident was harmless.

### B. Voicemail

[28] Wilderness also argues that the trial court abused its discretion when it admitted the recording of the voicemail that Junior left for Marisa that captured interactions between Wilderness and Junior around the time of the shooting. He asserts that the recording should not have been admitted because it was so unintelligible as to invite speculation and assumption that it said what the State claimed it did. Wilderness claims that a review of the recording reveals that due to the crying of the children and the poor quality of the audio, very little can be deciphered and no witness testified as to the events depicted on the recording, which left the jury to speculate about its contents.

[29] To properly admit a tape recording made in a non-custodial setting, the following foundational requirements must be established: (1) the recording must be authentic and correct; (2) the testimony elicited must have been freely and voluntarily made; (3) the recording must not contain matter otherwise not admissible into evidence; and (4) the recording must be of such clarity as to be intelligible and enlightening to the jury. *Coleman v. State*, 750 N.E.2d 370, 372-

73 (Ind. 2001). It is within the trial court's discretion to determine whether such recordings meet these criteria. *Id*.

[30] Here, before admitting the recording into evidence, the trial court reviewed the voicemail and found, "I think that there are enough intelligible portions to be helpful to this jury." *Tr. Vol. 4* at 48. A review of the evidence shows that both Wilderness and Junior can be intelligibly heard in the recording, and it captured some of their interactions around the time of the shooting. *State's Ex.* 210. Junior can be heard yelling at his father, "Shoot me N*****, shoot, shoot, shoot!" *Id*. at 00:28-33. Wilderness can be heard stating, "get out of my house boy." *Id*. at 2:26-28. The trial court was within its discretion to find that the recording was of such clarity as to be intelligible and enlightening to the jury to show the interactions between Junior and Wilderness around the time of the murder. *Coleman*, 750 N.E.3d at 373.

[31] Further, the trial court was not required to exclude the recording simply because parts of it were unclear. "Perfect quality is not required; rather taken as a whole, the recording must be of such clarity that it does not lead the jury to speculate about its contents." *Hall v. State*, 897 N.E.2d 979, 981 (Ind. Ct. App. 2008) (citing *Brown v. State*, 577 N.E.2d 221, 230 (Ind. 1991)). Here, the recording reflected the general tenor of the conversation between Junior and Wilderness around the time of the murder, and the intelligible parts enlightened the jury as to the interactions between the two. We believe that taken as a whole the recording was of such clarity that it did not lead the jury to speculate

as to its contents.  The trial court did not abuse its discretion by admitting the recording.

## C. Exclusion of Hearsay

[32]    Wilderness also contends that the trial court abused its discretion when it admitted selective portions of his statements to law enforcement while simultaneously excluding related portions as self-serving hearsay.  He claims that he was improperly denied the ability to present his full statement to police made outside of his house, his full police interview, and his full 911 call. Wilderness asserts that by excluding these statements and admitting only selective portions, the testimony misled jury to believe that he coldly and callously shot his son and left him to die with no contemporaneous explanation and that the evidence he sought to admit would have corrected that misperception.  Wilderness further argues that the exclusion of the statements was not harmless error because the excluded statements would have impeached the law enforcement officers and were closely related to the controlling issue of whether he acted in self-defense.

[33]    "Generally, a defendant who does not testify cannot introduce exculpatory statements made outside of court in order to enhance his credibility at trial." *Sweeney v. State*, 704 N.E.2d 86, 110 (Ind. 1998), *cert. denied*, 527 U.S. 1035 (1999).  However, under the doctrine of completeness, "'when one party introduces part of a conversation or document, [the] opposing party is generally entitled to have the entire conversation or entire instrument placed into evidence.'"  *Id.* (quoting *McElroy v. State,* 553 N.E.2d 835, 839 (Ind.1990)).  The

remainder of the statement is subject to the general rules of admissibility, and any portions found immaterial, irrelevant, or prejudicial must be redacted. *Id.* The doctrine of completeness applies even for self-serving hearsay statements. *McElroy,* 553 N.E.2d at 839. The trial court is not required to admit remaining portions of the statement "that are neither explanatory nor relevant to the portions already introduced." *Barnett v. State*, 916 N.E.2d 280, 286 (Ind. Ct. App. 2009), *trans. denied*.

[34] Initially, we note that Wilderness has waived a portion of his argument. When objecting to the trial court, he raised no claim that either his statement outside his residence to law enforcement or his police interview should be admitted under the doctrine of completeness. *Tr. Vol. 4* at 125-26; *Tr. Vol. 5* at 175-77. As a general rule, a party may not present an argument or issue on appeal unless the party raised that argument or issue before the trial court; in such circumstances the argument is waived. *Shorter v. State*, 144 N.E.3d 829, 841 (Ind. Ct. App. 2020), *trans. denied*. If Wilderness had raised this issue to the trial court, the State would have had the opportunity to address whether the admitted portions of those statements were misleading without the excluded portions.

[35] Further, Wilderness failed to make an offer of proof regarding the omitted portions of his interview with police and 911 calls. *Tr. Vol. 5* at 171-78. In order to preserve the exclusion of evidence for appellate review, a defendant must make an offer of proof. *Fowler v. State,* 929 N.E.2d 875, 881 (Ind. Ct. App. 2010), *trans. denied*. The purpose of an offer of proof is to convey the point of

the witness's testimony and provide the trial judge the opportunity to reconsider the evidentiary ruling. *State v. Wilson*, 836 N.E.2d 407, 409 (Ind. 2005). To accomplish these two purposes, an offer of proof must be sufficiently specific to allow the trial court to determine whether the evidence is admissible and to allow an appellate court to review the correctness of the trial court's ruling and whether any error was prejudicial. *Id*. Wilderness argues that the 911 call was sufficiently preserved because the excluded evidence was apparent from the context. However, the evidence presented from the 911 call -- that Wilderness admitted to shooting Junior, that Junior was having trouble breathing, and that Wilderness was not willing to perform CPR -- do not provide any context as to what was contained in the rest of the over five-minute phone call. *Tr. Vol. 5* at 171-74, 197.

[36] Waiver notwithstanding, Wilderness has not shown that the excluded evidence was otherwise admissible and relevant to explain the portions already introduced. "In determining what portion of a statement should be admitted, the trial court should consider whether '(1) it explains the admitted evidence, (2) places the admitted evidence in context, (3) avoids misleading the jury, and (4) insures fair and impartial understanding of the evidence.'" *Lewis v. State*, 754 N.E.2d 603, 607 (Ind. Ct. App. 2001) (quoting *United States v. Li*, 55 F.3d 325, 330 (7th Cir. 1995)), *trans. denied*. At trial, Wilderness argued it was "just not fair to let the State choose and pick" what parts of the 911 call to present testimony on, but he did not argue to the trial court that the jury needed the remainder of the 911 call to understand the testimony admitted or that the jury

would be misled without the full recording. *Tr. Vol. 5* at 173. Because Wilderness did not make any claim at trial that the remainder of the 911 recording was necessary to understand and not be misled by the admitted evidence, the trial court was within its discretion to deny his request for admission of the statements under the doctrine of completeness.

[37] Even if the trial court abused its discretion, any error was harmless because Wilderness testified at trial and was able to testify regarding his own statements. *See McElroy*, 553 N.E.2d at 839-40 (finding that even though the trial court erred in preventing the defendant from cross-examining an officer regarding certain self-serving statements such error was harmless because the defendant was able to present his recollection of the interrogation during his testimony). Wilderness testified at trial and was able to tell his version of the entire matter, including explaining what he told the 911 operator during the call and the statements he made to the police during his statement and subsequent interview. On appeal, Wilderness argues that he should have been allowed to use the self-serving hearsay because it would have bolstered his claim of self-defense. *Appellant's Br.* at 43. However, if Wilderness wanted to present the previously excluded evidence after he testified because of its relevance to his claim of self-defense, he could have offered that as an evidentiary basis for its admission at that time. We conclude that Wilderness had not shown that the trial court erred when it excluded the challenged evidence.

# II.   Mistrial

[38]   Wilderness also contends that the trial court abused its discretion when it denied his request for a mistrial after the jury was exposed to previously excluded evidence that he pointed a gun at Patricia.  He asserts that a mistrial should have been granted because the "prejudicial and persuasive effect of the excluded testimony was enormous" and that there was a high risk that the evidence was misused as propensity information.  *Appellant's Br*. at 30.  He further maintains that the evidence allowed the jury to make a logical inference that he pointed the gun at Patricia and, therefore, had the propensity to pull his gun during verbal disputes with his family.  In addition, Wilderness argues that the trial court's admonishment was not sufficient to protect him from peril.  He claims that the record showed that the jury did not follow the trial court's admonishment because the questions submitted by the jury that dealt entirely with Wilderness's propensity to make threats.

[39]   "We review a trial court's decision to deny a mistrial for abuse of discretion because the trial court is in 'the best position to gauge the surrounding circumstances of an event and its impact on the jury.'"  *Cherry v. State*, 971 N.E.2d 726, 732 (Ind. Ct. App. 2012) (quoting *McManus v. State,* 814 N.E.2d 253, 260 (Ind. 2004), *cert. denied*, 546 U.S. 831 (2005)), *trans. denied*.  A mistrial is appropriate only when the questioned conduct is "so prejudicial and inflammatory that [the defendant] was placed in a position of grave peril to which he should not have been subjected."  *Id*. (citing *Mickens v. State,* 742 N.E.2d 927, 929 (Ind. 2001)).  The gravity of the peril is measured by the

conduct's probable persuasive effect on the jury. *Id.* The declaration of a mistrial is an extreme action which is warranted only when no other recourse could remedy the perilous situation. *Pavey v. State*, 764 N.E.2d 692, 698 (Ind. Ct. App. 2002), *trans. denied*.

[40] When faced with a circumstance that a defendant believes might warrant a mistrial, generally the correct procedure is to request an admonishment. *Isom v. State*, 31 N.E.3d 469, 482 (Ind. 2015), *cert. denied*, 136 S. Ct. 1161 (2016). If counsel is unsatisfied with the admonishment or it is obvious that the admonishment will not be sufficient to cure the error, then counsel may move for mistrial. *Id.* A "failure to request an admonishment *or* move for a mistrial results in waiver of the issue." *Id.* (emphasis in original). In essence "waiver occurs where there was neither a request for admonishment *nor* a motion for mistrial." *Id.* (emphasis in original).

[41] In the present case, during the hearing about the January incident, the trial court excluded any mention of Wilderness placing a gun to anyone's head. *Tr. Vol. 5* at 94-95. The trial court further told the State to instruct its witnesses concerning the exclusion of this testimony. *Id*. at 96. During cross examination of Marisa, however, the following exchange occurred:

> [DEFENSE COUNSEL]: Okay. So in June of 2018 you testified under oath that you did not remember the conversation, right?

[MARISA]:  The topic was about the divorce.  I do not remember what the discussion was that led up to my father getting up and putting a gun in my mother's face.

*Id.* at 144-45.  Defense counsel then asked to approach the bench and moved for mistrial on the basis of Marisa's answer.  *Id.* at 145.  The trial court denied the motion and instead gave the following admonishment to the jury:

The last comment by the witness has nothing to do with our -- our case.  And you're admonished to disregard it and it should play no role in your discussion at the end of the trial and certainly the ultimate issue on whether, you know, this event occurred or how it occurred.  So I admonish you, I inform, you that you are to disregard that last comment by the witness.  It should not enter into your discussions, as we move forward with this trial.  Keep this in mind.

*Id.* at 147.  Additionally, the jury received a specific instruction at the beginning of the trial to not consider stricken evidence:

During the trial, the court may rule that certain questions may not be answered and/or that certain exhibits may not be allowed into evidence.  You must not concern yourselves with the reasons for the rulings.  The court's rulings are strictly controlled by law. Occasionally, the court may strike evidence from the record after you have already seen or heard it.  You must not consider such evidence in making your decision.  Your verdict should be based only on the evidence admitted and the instructions on the law. Nothing that the court says or does is intended to recommend what facts or what verdict you should find.

*Appellant's App. Vol. II* at 135.

[42] Wilderness was not subjected to grave peril because of the single reference to him pointing a gun during the January incident. The comment by Marisa was not intentionally presented by the State but, instead, occurred during cross-examination despite a previous warning from the State to its witnesses to not mention Wilderness pointing a gun at anyone. *Tr. Vol. 5* at 144-46. *See Carter v. State*, 686 N.E.2d 834, 836 (Ind. 1997) (whether the evidence was intentionally injected or came in inadvertently is a relevant factor in analyzing whether testimony of prior acts warrants a mistrial). Any peril was immediately addressed when the trial court admonished the jury not to consider the testimony in their determination of the ultimate issue. This admonishment coupled with the trial court's preliminary instruction to the jury to not consider stricken evidence cured any error in the inadvertent comment by Marisa. *See Lucio v. State*, 907 N.E.2d 1008, 1011 (finding that trial court did not abuse its discretion in denying a motion for mistrial after the jury heard testimony that the defendant had been previously incarcerated because the admonition was presumed to cure any error and the statement was inadvertent, and only a minor part of the evidence against the defendant).

[43] Although Wilderness concedes that the admonishment would normally be sufficient to cure any error, he alleges the admonishment here was ineffective because a juror submitted a question regarding whether Wilderness had "ever pulled his gun on anyone during a verbal dispute before." *Appellant Br*. at 31 (citing *Ct.'s Ex* 3). However, the mistrial issue was about Marissa violating a motion in limine by testifying that Wilderness pointed a gun. The trial court

had previously allowed certain 404(b) evidence to include testimony that Wilderness had brandished a gun during the January incident. *Tr. Vol. 5* at 95-96. "Pulling" a gun during the January incident was not part of the trial court's order -- only pointing the gun at anyone. Based on this, the juror's question did not show that the trial court's admonishment was ineffective or that Wilderness was placed in such grave peril that a mistrial was necessary. The trial court did not abuse its discretion when it denied Wilderness's request for a mistrial.

## III. Jury Instructions

[44] Wilderness argues that the trial court committed fundamental error in instructing the jury regarding self-defense. Specifically, he contends that Final Instructions 3 and 13 were "incorrect statements of law that, in the context of all relevant information, misled the jury as to a correct understanding of the law of self-defense." *Appellant's Br*. at 45. As to Final Instruction 3, Wilderness alleges that it failed to inform the jury that before they could convict him of murder, the State must also prove beyond a reasonable doubt that he did not act in self-defense. He maintains that Final Instruction 3, which contained the elements of murder, should have further required the jury to find that the State disproved self-defense beyond a reasonable doubt. As to Final Instruction 13, Wilderness asserts that it was an incorrect statement of law because it only instructed the jury that the defendant may use self-defense where it is "necessary to do so to protect his life or to protect his person from great bodily harm." *Appellant's App. Vol. II* at 156. He claims the instruction was erroneous because "great bodily harm" was not broad enough to encompass Indiana's

statutory self-defense, which allows a person to use lethal force to prevent the commission of any forcible felony. *Appellant's Br.* at 47 (citing Ind. Code § 35-41-3-2(c)(2)).

[45] The manner of instructing a jury is left to the sound discretion of the trial court. *Albores v. State*, 987 N.E.2d 98, 99 (Ind. Ct. App. 2013), *trans. denied*. We review the trial court's decision only for an abuse of that discretion. *Id.* Wilderness did not object to the jury instructions given by the trial court. Failure to object to a jury instruction results in waiver on appeal, unless giving the instruction was fundamental error. *Barthalow v. State*, 119 N.E.3d 204, 211 (Ind. Ct. App. 2019). "An error may be fundamental and thus not subject to waiver, if it is a 'substantial blatant violation of basic principles.'" *Id.* (quoting *Moreland v. State*, 701 N.E.2d 288, 294 (Ind. Ct. App. 1998)). The error must be so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* "This exception to the general rule requiring a contemporaneous objection is narrow, providing relief only in 'egregious circumstances' that made a fair trial impossible." *Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016).

[46] In considering a claim of fundamental error with respect to jury instructions, we look to the instructions as a whole to determine if they were adequate. *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010). When determining whether a defendant suffered a due process violation based on an incorrect jury instruction, we look not to the erroneous instruction in isolation, but in the context of all relevant information given to the jury, including closing argument, and other instructions. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014).

When all information, as a whole, does not mislead the jury as to the correct understanding of the law, there is no fundamental error. *Boesch v. State,* 778 N.E.2d 1276, 1279 (Ind. 2002).

[47] Wilderness first argues that Final Instruction 3, which informed the jury of the elements of murder and that these elements must be proven beyond a reasonable doubt, was erroneous because it should have further included language requiring the jury to find that the State disproved self-defense beyond a reasonable doubt. However, Wilderness cites no authority that an instruction on the elements of murder is fundamentally erroneous if it does not address the State's burden to disprove self-defense. He cites to cases which involved instructions for voluntary manslaughter and which found error where the instructions misstated the law by improperly requiring the State to prove, instead of disprove, sudden heat, *Eichelberger v. State*, 852 N.E.2d 631, 639 (Ind. Ct. App. 2006), *trans. denied*, or by only allowing consideration of voluntary manslaughter if the defendant is found not guilty of murder, *Roberson v. State*, 982 N.E.2d 452, 460 (Ind. Ct. App. 2013). However, voluntary manslaughter is not a defense to murder; it is a separate offense which includes all the elements of murder and additionally requires the State to disprove sudden heat. *See* Ind. Code § 35-42-1-1; Ind. Code § 35-41-1-3.

[48] In looking at the instructions as a whole, they correctly stated the law as the jury was specifically informed in Final Instruction 12 that "[t]he State ha[d] the burden of disproving the defense of self-defense beyond a reasonable doubt" and before the jury could find "the defendant guilty of the crime charged, you

must find beyond a reasonable doubt that the defendant was not acting in self-defense." *Appellant's App. Vol. II* at 155. Nothing in Final Instruction 3 suggested that self-defense was not available. *Id.* at 146. Because we do not find that the instructions as a whole misstated the law or otherwise misled the jury, Wilderness has not shown that Final Instruction 3 amounted to fundamental error. *Munford*, 923 N.E.2d at 14.[3]

[49] Wilderness next argues that the trial court committed fundamental error by instructing the jury in Final Instruction 13 that a defendant may only use lethal force as self-defense to "protect himself from an assailant" where he honestly and reasonably believes that the force is necessary "to protect his life or to protect his person from great bodily harm." *Appellant's App. Vol. II* at 156. The language in the instruction, including the challenged "great bodily harm" language, was a correct statement of law based on precedent from the Indiana Supreme Court: "In order to prevail on a claim of self-defense a defendant must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm." *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011); *see also Randolph v. State*, 755 N.E.2d 572, 576 (Ind. 2001); *Wallace v. State*, 725 N.E.2d 837, 840 (Ind.

---

[3] Although Wilderness is correct that that the commentary introducing Chapter 10 of Indiana's Pattern Criminal Jury Instructions does state that an element instruction should be modified to include a defense when a defense is properly raised, the pattern instructions "are not formally approved" for use. *Campbell v. State*, 19 N.E.3d 271, 275 n.3 (Ind. 2014).

2000); *Jordan v. State,* 656 N.E.2d 816, 817 (Ind. 1995); *Wade v. State*, 482 N.E.2d 704, 706 (Ind. 1985).

[50] Wilderness, however, maintains that Final Instruction 13 was erroneous because "great bodily harm" does not encompass language in Indiana's self-defense statute, which allows a person to use lethal force to prevent the commission of any forcible felony. *See* Ind. Code § 35-41-3-2(c). Although Final Instruction 13 does not contain the language concerning lethal force, the jury was also specifically instructed of the statutory right to use such force in Final Instruction 12, which stated in pertinent part, "a person is justified in using deadly force and does not have a duty to retreat if the person reasonably believes that the force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." *Appellant's App. Vol. II* at 155. Therefore, reading the instructions as a whole, we do not find that the instructions given by the trial court misstated the law or otherwise misled the jury, and Wilderness has not shown that Final Instruction 13 amounted to fundamental error. *Munford*, 923 N.E.2d at 14. We conclude that the trial court did not commit fundamental error in instructing the jury.

## IV. Prosecutorial Misconduct

[51] Wilderness contends that, in its rebuttal closing argument, the State committed prosecutorial misconduct, which rose to the level of fundamental error. Specifically, he argues that a statement made by the State was an evidentiary harpoon and placed prejudicial facts in evidence that had been previously

excluded. Wilderness further asserts that this misconduct rose to the level of fundamental error as it subjected him to grave peril because it invited the jury to infer from facts not in evidence that Wilderness was "a lawbreaker who would then lie about it" and for the jury to disregard Wilderness's testimony regarding his claims of self-defense on the basis of a criminal behavior for which he was not charged and for which no evidence was produced. *Appellant's Br.* at 52.

[52] In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine "(1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected' otherwise." *Ryan*, 9 N.E.3d at 667 (quoting *Castillo v. State,* 974 N.E.2d 458, 468 (Ind. 2012)). "A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct." *Id*. (citing *Mahla v. State,* 496 N.E.2d 568, 572 (Ind.1986)). Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. *Id*. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id*. To preserve a claim of prosecutorial misconduct, the defendant must request an admonishment to the jury at the time the alleged misconduct occurs, and if further relief is desired, move for a mistrial. *Id*.

[53] However, Wilderness did not object or request an admonishment as to the challenged statement by the State. Where a claim of prosecutorial misconduct

has not been properly preserved, our standard for review is different from that of a properly preserved claim. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. Ct. App. 2006). In such circumstances, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error. *Ryan*, 9 N.E.3d at 667-68. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Cooper*, 854 N.E.2d at 835. In establishing fundamental error, the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." *Ryan*, 9 N.E.3d at 668. In other words, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." *Id.* (citations omitted). "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id.*

[54] Here, the statement challenged by Wilderness occurred during the State's rebuttal closing argument when the prosecutor stated, "Let's talk about credibility. Defendant's own words. He says he doesn't carry firearms where he isn't allowed. And I pose the question, 'Can non-law enforcement officials carry firearms at a high school basketball game?' Can they?" *Tr. Vol. 6* at 65-66. In making this statement, the prosecutor was challenging Wilderness's

credibility because Wilderness testified that he only carried his guns where guns are allowed but also admitted during his direct testimony that he brought two firearms to a high school basketball game on the night of the murder:

Q: How long were you at the game, [Wilderness]?

A: About a good hour and ten minutes.

Q: . . . do you have permit to carry firearms?

A: Yes, I do.

Q: Did you have firearms with you, when you went to the game?

A: Yes, I did.

*Tr. Vol. 5* at 222, 244-45.

[55] "'It is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence.'" *Neville v. State*, 976 N.E.2d 1252, 1261 (Ind. Ct. App. 2012) (quoting *Steinberg v. State,* 941 N.E.2d 515, 531 (Ind. Ct. App. 2011), *trans. denied*), *trans. denied*. Prosecutors may not argue facts not in evidence. *Id.* (citing *Spangler v. State,* 498 N.E.2d 1206, 1209 (Ind. 1986)). In *Oldham v. State*, this court found that final argument alleging a defendant committed a crime "not charged and [that] is unsupported by the evidence subjects a defendant to such grave peril as to entitle him to reversal and to a new trial." 779 N.E.2d 1162, 1176 (Ind. Ct. App. 2002), *trans. denied*.

[56] Wilderness claims the challenged statement by the prosecutor was a misstatement of the record because the prosecutor never asked about the legality of guns at schools and was specifically denied a request to ask a police officer about the legality of carrying firearms in a high school basketball game. *Tr. Vol. 6* at 18. However, here, no misconduct occurred because the prosecutor's challenged statement was based on the evidence at trial. The prosecutor did not misstate the evidence and, instead, asked the jury to rely on its own common knowledge that schools are gun-free zones. *Id*. at 65-66. The present case is distinguishable from *Oldham*, where the argument of other bad acts was "unsupported by the evidence[.]" 779 N.E.2d at 1176. Here, the prosecutor raised an issue of credibility based on Wilderness's testimony that he had his firearms with him when he attended a high school basketball game. *Tr. Vol. 5* at 222. Wilderness also asserts that the prosecutor's argument was improper because it ignored that firearms may be legally secured in a vehicle on school property. *See* Ind. Code § 35-47-9-2(b). However, Wilderness's testimony did not indicate that such precautions were taken and instead only established that he had the firearms with him when he went to the game. *Tr. Vol. 5* at 222.

[57] Even if the prosecutor's statements constituted misconduct, fundamental error still did not occur because the misconduct was not so prejudicial to Wilderness's rights as to "make a fair trial impossible." *Ryan*, 9 N.E.3d at 668. This case did not involve statements concerning prior misconduct that was not supported by the evidence presented as occurred in *Oldham*. *See* 779 N.E.2d at

1176. Here, the prosecutor limited his argument to the facts presented at trial and asked the jury to draw a conclusion on credibility from those facts. We conclude that Wilderness has not proven that the State committed prosecutorial misconduct that rose to the level of fundamental error.

## V.  Cumulative Error

Wilderness argues that the cumulative effect of the above errors, as well as other errors found but not adequately preserved in the record, rendered his trial fundamentally unfair. A defendant is entitled to a fair trial, not a perfect trial. *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014). The Indiana Supreme Court has "been willing to assume, 'for the sake of argument, that under some circumstances the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation, in this case it is clear in light of the evidence of guilt that no prejudice resulted from any of the erroneous rulings, individually or cumulatively.'" *Id.* (quoting *Hubbell v. State*, 754 N.E.2d 884, 895 (Ind. 2001)). Here, we do not find error, much less errors that resulted in prejudice. Accordingly, reversal is not warranted.

Affirmed.

Pyle, J., and Tavitas, J., concur.